The first case today is number 181313, Tara J. Roy v. Correct Care Solutions, LLC et al. Chief Judge Lynch, members of the panel, may it please the Court, my name is I'm sorry, I'm no longer Chief Judge. Excuse me. After seven years you time out as now Chief Judge Howard. And the other thing is do remember we're judges and not justices. Thank you. My name is John Gause and I represent Tara Roy, who is here in the courtroom today with her husband. And I would like to reserve two minutes for rebuttal, if I may. You may. I have allotted five minutes of my time to the EEOC and five minutes of my time to the Maine Human Rights Commission to address two of the issues in the case, including whether there is non-employer liability under the Maine Human Rights Act that the Maine Human Rights Commission is going to be talking about. Would you mind pulling that mic a little closer to you? Sure. It's tall. Yeah. Excuse me. Thank you. And then the EEOC is going to be talking about Title VII standard for retaliation. I'd like to just briefly give an overview of what the claims are because there's a lot going on in this case, as the Court I'm sure is aware from reading materials. Essentially it is a hostile work environment and a termination case. And Tara, as you know, was a nurse at the Maine State Prison working for CCS, the two defendants in this case. And there's also the warden and the deputy warden who are defendants on the constitutional claims. But, again, the two claims are hostile work environment and termination. The basis for the hostile work environment. Since amicus, I think, are not going to address this, can you talk about the two constitutional claims against the two individuals? First, there is the question of whether you have, in fact, presented enough evidence of a claim of deliberate indifference. But, secondly, we have as to both claims the issue of qualified immunity. So perhaps you could start with why you think they're not entitled to qualified immunity, at least at this stage of the proceedings. Yes, Your Honor. The qualified immunity analysis that the district court judge undertook was to, I think, resolve a factual issue in favor of the two defendants here. The factual issue being whether, rather, those defendants terminated Ms. Roy's security clearance based on a false report by her. And without that factual determination being resolved for the two defendants, what they did is terminated her for her First Amendment protected activity. I think that there is a factual dispute as to whether she was terminated for, quote, falsifying a report because of what she said. What the defendants claim is that she said that she was left alone in the clinic for... Is there a factual dispute? I'm just trying to figure out what the factual dispute is about. There's not a factual dispute as to why the defendants say they deny the security badge clearance, right? There's not a dispute about that being the stated reason. There is a dispute about whether that was the actual reason, yes. And so for qualified immunity purposes, how clear does the pretext have to be in order for them not to get qualified immunity? Do you see the question I'm asking? In other words, do we think of that as just an ordinary factual dispute as if it was just a Title VII pretext issue? Or because it's qualified immunity, when they state, here's why I did it, and that's undisputed. When we then look at the question of pretext, given the idea of reasonable mistake, how are we supposed to think about the kind of clarity the show of a pretext would have to be in order to surmount qualified immunity? Yes, I think the jury just, I mean, I think the court needs to decide whether there's a factual issue for the jury to decide as to whether they actually fired her for the falsified report. Let's, even assuming there is a dispute about that, Judge Barron is asking, given the standards for qualified immunity that require both clearly established law and that no reasonable officer in that position could have thought that they were violating either equal protection or First Amendment, could you answer that? Yes, if the determination were that they did not fire her for falsifying a report and they falsified her for First Amendment protected activity, then there is no issue for qualified immunity to be decided. I guess, but the question is, could they have reasonably been mistaken in thinking that there was a false report that she had made and therefore that's why they denied the badge? What's your answer to that, which is that the jury could just, once the jury concludes, no, they did not think that the sort of reasonable mistake issue just washes out? If they could, Your Honor, reach that decision that they were on the fence on this, then I would agree that you're in the qualified immunity area. But I don't think that this record conclusively establishes that. I think that it establishes enough for a jury to find that they did not have that belief at all. What I find sort of interesting here is the only written report is by the other nurse, and that report basically said the same thing. It seems that, and I'd like your take on this, it seems they said that the report was false, that she didn't make in written form. But because she didn't make it, even though the other person's report was the same as she would have made if she had made it, it made no difference, and I have some difficulty. What is your take on that? The record does not establish that she said to anybody that it was 15 minutes. The report does say 15 minutes. I realize that they say that. However, the decision-maker here, Warden Bouffard, gave three reasons for his decision. One was the report that he got from the captain in which the captain reported that she had said 15 minutes. That also, if the court reads that report carefully, it doesn't say even that Ms. Roy said that she was left alone for 15 minutes. It says that she was left alone and then the officer came 15 minutes later, which turned out to be six minutes. But he gave two other reasons as well. One being the sexual harassment complaint of hers that he said was a Facebook complaint. Outside of the record, which they should consider, and that's another question, obviously. Correct. So he gave that as one of the reasons. He gave the failure to write the report, and he gave what the captain told him about the 15 minutes. But then he said that what was more important than failure to write the report was the 15-minute issue, which comes back to Judge Barron's point, I believe. Did the district court say that there was a six-minute lag? Somewhere in my memory, there's something about six minutes that appeared to be agreed to. Right. We have the benefit of a video of the clinic on that day. The problem with the video is that it's not continuous. It takes snapshot, snapshot, snapshot. So you see people coming in and out, and the best I think that anybody could do was come up with six minutes that the officer actually showed up in the clinic. Okay. I know you give a lot of time to people assisting you to talk about the Title VII issue, but on the retaliation Title VII issue, since it relates in some ways to what we were just discussing, I just want to understand one point about it. For the constitutional claim, it's not the employer who's retaliating. Is that right? Constitutional claim, it's the individual defendants that are retaliating, but then also that they're failing to prevent the retaliation by the officers. So it's twofold. So in the two, are the CCS or CSS? The two on the retaliation claim, the CCS is the actual employer for the retaliation claim, and then the Main Human Rights Act retaliation claim is. The individuals that are being sued under the First Amendment retaliation claim are whom? Are they MDOC employees or are they CS? MDOC. MDOC employees. Yeah, warden and deputy warden. Right. So the thing they did to retaliate was to take away the badge, take away the security clearance. That's the idea? What they did for retaliation finally was to take away the security clearance, yes. Okay, so now on the Title VII claim for retaliation, the defendants are not the MDOC persons, it's CSS. For the Title VII only against CCS, correct. Can you just help me with this? What do you have to show to show CCS was retaliating when CCS says what we were doing was acting on the fact that the security clearance had been taken away? Now, you say you can prove, or a jury could find, that the MDOC actors took away the security clearance for pretextual reasons, which was that they intended to retaliate because she had done protected conduct. When we get to CSS, we're a step away from that. So if you could show that the MDOC persons had a retaliatory mindset, notwithstanding their claim that they did not, what do you have to show with respect to the CSS persons in order to make a pretext showing with respect to their stated assertion that, well, once she doesn't have a security clearance, we simply can't have her working here? Right. So that they essentially adopted the state defendant's reason that they knew about. I'm just trying to figure out what that means exactly, because in fact there's no security clearance. She doesn't need the security clearance to work for them. There are other areas where she can work without it. Is there evidence in the record of that? Yes. And there is evidence of the record that other persons who do not have security clearances nonetheless were allowed to do her same functions? There's not evidence of that, Your Honor. Do you need that? I don't believe so. That's what I'm trying to figure out. Right. What essentially is going on here is a client that wants to keep a customer happy. Counsel, I understood you to say they could have transferred her to other facilities, not that she didn't need a security clearance to work at this facility. Is that correct? She needed a security clearance to work at this particular facility but not the others. So your retaliation claim is they didn't take other actions which were open to them to transfer her to another facility. They say there are different collective bargaining agreements that couldn't just do that. All right. They've given a response. What is your response to their response? Your Honor, I have not seen them say any reason. They didn't even explore whether they could move her to another facility. So they've not offered one. The only reason that they've offered for firing her is that she lost this particular security clearance. Did she request a transfer? Before she was fired, she did request a transfer saying, I'm being sexually harassed. Once they informed her that she was going to be, after not having had a security clearance, did she request a transfer? Not at that point. She was just told that she... Why isn't that a problem for you on the retaliation claim? How can you show it's pretext? If they say the reason she was terminated from this position is that she didn't have a security clearance and you need one to work here, that's unrebutted. Right. But they don't have to fire her for that. It's like a temp agency that is placing somebody in one business and then that business says you can't come back here anymore. The temp agency doesn't have to fire that employee. It's up to the temp agency to decide whether to put that employee somewhere else, and here they just decided to fire her. But you say you never requested it, and therefore their nonresponse to your nonrequest somehow shows retaliation? I don't believe that there needed to be a request in a context where she's told that she's fired. She was simply told that she was fired with nothing more than that. And there had been a previous request for a transfer. So it was like a futility argument. There's no need to make the request because it was obvious it would be rejected or something like that, or jury could find that. Yes, there had been a previous request. Thank you. Thank you. Good move. May it please the Court, Gail Coleman for the EERC. I'd like to discuss the hostile work environment claim under Title VII. The district court here erred by resolving genuine issues of material fact on summary judgment. The court wrongly characterized the incidents in question as based either on sex or on whistleblowing, but in fact human motivation is more complex than that, and a reasonable jury could find that the harassment was based on both. The real question here is would a male whistleblower have been treated the same way? In order to answer that question, the court should look at the totality of circumstances. It's true that Roy testified that she believed that some of the harassment was because of whistleblowing, but her belief is not dispositive on this question. In Crowley, this court said that it doesn't matter that a plaintiff doesn't figure out until later that it was sexual harassment. What matters is that she felt that it was abusive at the time. Here there are a number of specifically sex-based incidents from which a reasonable jury can find animus based on gender. Turner made constant derogatory comments about women and blondes. That's at page ID 475 of the record. Dever spread a false rumor that she was sleeping with everybody in the prison. D'Aguisto told her that Dever was spreading this false rumor. Moreover, when she refused to give him her phone number, he told her to smile at work and said he was tired of her attitude. Harrow called her a bitch when she rejected a quite graphic sexual proposition. And this court has said in both Francina and Forrest that bitch is an inherently gender-laden term. Grito referred to her fat, lazy ass, which a jury could find is gender-based. The EEOC produced a litany of cases in our brief where sexual harassers used something like that term. And that was considered sex-based. And then Snow made repeated comments to her being a dumb blonde and actually assaulted her. Whether or not Snow's actions are part of the same hostile work environment, it still is relevant background showing gender animus. The court erred by disaggregating the incidents that were not obviously sex-based from all of this evidence. In O'Rourke, this court explains that evidence must be looked at in context. Again, the question is, would she have been put in the same situations if she were a man? She said in her transfer request that she believed that she was being harassed because she was a young woman in a primarily male environment. If she had been a man, would she have been left alone in the infirmary in the first place? Before you go on further, just so I understand the argument, one form of the argument is that to get to the level of seriousness that we've said for hostile work environment cases, the strongest evidence, it seems to me, of the seriousness of the treatment are the actions that were taken that put her in danger by not being present, leaving her alone in cells and that type of thing. Do you follow? I follow. Yeah. Am I right that the evidence shows that that action is undertaken by Turner alone? Or are there others who also did that? I believe it was, well, it wouldn't have been undertaken by Turner alone because the last incident leading to that 15-minute dispute, Turner was no longer assigned to the clinic. So who else is involved in having left her alone? Do you know of another name besides Turner? I don't believe there is another name. But importantly, the standards are hostile. Just so I, I don't want to go in steps so I understand this. Sure. Let's just take for a second that the situation is that Turner leaving her alone repeatedly in those situations is the kind of harassment that clearly would rise to the level so that if it was because of sex, there would be an actionable claim. There's evidence of Turner making comments which would enable one to conclude that Turner took that action because of sex. I assume as you've laid it out that you could. In that event, are the other comments of any relevance to Turner's conduct in leaving him alone in determining whether leaving her alone was because of sex? Do you follow? I think so. Yeah. I haven't been able to find in the case law how we're supposed to think about that. And so the premise of this is that the comments alone might raise a more difficult question under our case law about the pervasiveness and the level. The question becomes much easier if you add in putting her in danger by leaving her. If that's done because of sex, it seems to me quite easy under our case law to conclude that this rises to that level. But on that score, I'm just not sure of the relevance of the comments by persons other than Turner that would provide a basis for inferring it was because of sex. I believe I understand what you're asking. And I don't know the answer to that. I can't give you names of other people in particular. But I will say, as you acknowledge, that the standard for hostile work environment is not just severe. It's severe or pervasive, and that's disjunctive. And in assessing severe or pervasive, the court should not be looking at each separate incident separately. In terms of pervasiveness, it would be relevant on everybody else's comments. And even the less severe, more generalized hostility towards her shown by everybody would be relevant. Now, this generalized hostility existed even before any whistleblowing. She testified that she was constantly being barraged with offensive comments and with general shunning and being ignored and her requests to bring prisoners to the infirmary were being ignored. She did testify that the shunning and that this behavior intensified after her whistleblowing. But a reasonable jury could find that because there was a sex-based animus before the whistleblowing, that continued into the post-whistleblowing time. So that all of it looked at in context could arguably be... I guess what I'm asking is, do you need the non-Turner evidence in order to make an actionable claim? So assuming that you look at everything else and you do have an actionable claim under pervasiveness...  But separately... So if you looked only at the Turner comments and the Turner conduct, would you have an actionable claim? You probably would, because it is a severe thing to leave... If I excluded all the Turner conduct and I looked only at the other conduct, would you have an actionable claim just based on the non-Turner comments and conduct? Absolutely. It would be pervasive even if it wasn't severe. Does that answer your question? What's your best case for the second point? For severe or pervasive? No. For the comments excluding the Turner conduct being itself actionable? Well, I think... Comments by Sparrow... Who else do we have? Sparrow... Harrow, Dever, D'Aquisto... Those three. Garrido and Snow. So five, actually. Let's take Snow out for a second because of the timing issue. Just those three. What would be the best case for saying just the comments by those three would be actionable? Those comments show their gender animus, which then infects everything else. Did you not... Just the comments, not the rest of what they were doing? What else were they doing? What else were they doing besides the comments? They also were... There was this generalized hostility that they were participating in. What conduct did that involve? That involved being exceptionally rude to her, not following her requests, ignoring her requests, which were work-related. So making her job harder for her to perform. Moreover, they were spreading a rumor that she was sleeping with everybody in the prison, which is certainly... That's sex-based. And there was evidence that when one officer was upset with somebody, all the officers were upset with somebody. So even without those particular comments, given that you have to look... Under a RORC, you have to look at everything in context. And the comments are part of the context. And then they are spreading around this hostility to the other officers who all band together in how they respond to someone. There certainly is enough here to show pervasiveness. Basically, you're saying it's an old-boy network, and it was a continual... Once the attack on one was an attack on all, it was considered that way. That's exactly right. And I would like to add that much of this record is sealed. So the EEOC's argument is based exclusively on what's in the public record. We don't know what else there might be. Before you leave us, could you address the retaliation issue against the employer and the colloquy we just had with your brother, counsel? The EEOC has not taken any position on the merits of the retaliation claim, and I'm not authorized to do that here. The EEOC came in on the retaliation claim solely because the court misanalyzed the protected activity question under retaliation for Title VII. It didn't address Title VII at all, and the federal standard is quite different from the state standard that it did apply. So you say he committed an error of law as to that. Yes. And that alone would be the basis to reverse some re-judgment. Exactly right, Your Honor. Okay. Thank you. Would it be reversal on that one, or to vacate and remand? Well, as I understand it, to vacate, reverse and remand, right, so that it would have to be done over in the district court. Thank you. Good morning. May it please the Court. I'm Barbara Archer-Hirsch, and I'm here for the Maine Human Rights Commission, specifically on the issue of non-employer liability for retaliation and interference under the Maine Human Rights Act. The Human Rights Commission has consistently interpreted its stand-alone retaliation and interference section as encompassing behavior by any person, whether an entity or an individual, and whether or not otherwise covered by the Maine Human Rights Act. For example, we have used it to reach neighbors who harass their neighbors, thus interfering with their right to be free from it. Yes, you've consistently interpreted it. Yes, maybe we owe some deference to you. Maybe we don't. I think you ought to get directly to why you think the district court was wrong in applying the Furman rule to this situation. Sure. I think that Furman has been wrongly expanded far beyond its actual holding, which is that under either the Maine Whistleblower Protection Act or the Maine Human Rights Act definition of employer, individual supervisors cannot be held liable as employers. There is no reference in Furman to section 4633, and there is no reference in section 4633 to employers or employment. Just so I understand the argument fully, if there was no 4633, do you agree under Furman there would be no individual supervisor liability?  So here's just the thing that I find puzzling. It's certainly clear 4633 says person, not employer, so I fully understand the textual argument. But as I understand Furman, they are clear that the employment discrimination provision was not supposed to provide for supervisor liability. They were clear about the employment. Exactly. Right. So here's just the odd thing. It's an odd way for a legislature to construct a statute that when they zero in on employment discrimination, they specifically write it so as not to include supervisor liability. And yet they have a catch-all provision elsewhere, not connected to employment discrimination, that you say must have been intended to provide for supervisor liability. I say that it provides for individual liability in any context. And therefore supervisor liability. It's a different sort of behavior. Could you help me understand that? In a case like this where the only allegation is supervisor didn't do anything and therefore is liable, just like the employer for not doing anything is liable. I'm a little confused. I thought that these claims were being brought against the prison. They are. It's not a supervisor. And that they are not supervisors of the employer. I thought there was an MRE or HCA claim against the individual CSS employees. Am I wrong? Not that I'm aware of. And only ones that are against the MDOC? Yes. Right. But just so the argument. He's going to test the logic of your argument in the employment situation. Correct. Thank you. So how does it work? Because your theory would apply equally if this claim had been brought against the individual supervisors. Correct? I don't know the record as far as what was done by any individual supervisor. We're here on just the issue of law. So whether or not there would be such a claim on this record, I can't tell you. Could you help me figure out why there might not be? Is that because of the word interfere? Why there might not be a claim against the individual supervisors? I think that if the individual supervisors had taken some individual intentional action, so not simply responding at superior liability, which is what Furman talked about. So if they had done something on their own, say, that was... How about not responding to complaints? I don't think not responding to complaints is necessarily enough. I see. It's something that is outside what their usual scope of duties would be. So in taking the position that you're taking, you're just saying simple point. It says person. That doesn't mean employer. Correct. Especially... And so we just... District Court got that wrong. The question of whether this would be an actionable claim under the MRHA, given the conduct that's alleged, is just a separate inquiry, which you're not taking any position on in this case. Is that right? I'm not taking any position as to what the outcome should be on the facts. But the retaliation claim that we were talking about is against the State, the Department of Corrections. If you look at Furman, they rely in part on legislative history. As I understand your argument, it is, well, that was legislative history in general and for the specific provision there. If you look at 4633, it was enacted later, and it has a different legislative history, and that's why Furman's reliance on legislative history doesn't work here. It doesn't apply in this case, where we're talking about, especially where we're talking about a third-party entity, and responding as superior doesn't apply. The logic of Furman is not applicable here. But, yes, the legislative history of 4633, which came later, specifically talks about holding persons and individuals liable, and that's different than employment discrimination. So a person would mean nothing. A person would mean nothing, the change, if we adopt the view of the appellee here. Or it would mean nothing, or there would be an implicit exception that is not in the statute. You would be taking a remedial statute and writing in an exception that doesn't exist in the text or anywhere. Okay. Thank you. Thank you. Good morning. Good morning. Please, the Court. My name is Melinda Caterin, and I'm here on behalf of the You're going to have to speak up. Sorry. My name is Melinda Caterin, and I'm here on behalf of the defendant appellee correct care solutions. As the district court correctly concluded, the conduct alleged by Roy was not sufficiently severe or pervasive to alter the conditions of her employment or to create a hostile or abusive working environment. A lot of the facts that the EEOC was talking about aren't supported in the record. I think that in order to Look, I think there are a lot of material facts in dispute. I think as to the retaliation claim, the district court didn't even purport to analyze it under Title VII. So maybe it would help if you talked first about the retaliation claim, and then we'll work backward. I think that what the district court did was to say that she couldn't prove her retaliation claim because the conduct that she complained about didn't rise to the level of unlawful sexual harassment, and therefore she wasn't engaging I think that by parsing and saying, oh, this wasn't caused by gender. It was caused by something else, and the EEOC is saying, well, that's not the right way to approach these questions. I think that the district court did All right. If you accept the EEOC legal proposition that you have to look at the entire context, isn't it pretty clear that if that's so, that the district court committed error here? I would disagree with that, Your Honor, for a couple of reasons. Okay, go ahead. First of all, I do think that the district court looked at the totality of the circumstances, but I think they also looked at what was in the statement of material facts, and he did look to see whether or not the record supported some of the factual allegations, and some of them just aren't supported in the record. For example, when she says that Officer Turner constantly did these things, that's not supported by the record that was supported in the statement of material facts, so I think the court did look at those things. Also, Ms. Roy repeatedly said during her deposition that the conduct that she was complaining about was not sexual harassment. I went through every single instance with her when she was raising an allegation, and she repeatedly said she wasn't claiming that it was sexual harassment, and she also repeatedly testified that some of the conduct that she was complaining about wasn't a violation of law or a rule or a health or safety risk. So if you look at the record, I think that it is fair for the... One thing I just wonder is isn't there an ambiguity in what she's saying when she makes those comments as to whether what she's saying is the conduct at the moment did not have any sexual, wasn't touching or that type of thing, but whether it was because of sex, she doesn't disclaim that it was because of sex. And I would disagree with that. I think that the defendants have a right to rely on her testimony when she says, I'm not claiming that this is sexual harassment. Okay, so we'll look at her deposition testimony, but could you please... Back to the retaliation, yes. So if you look beyond what the district court judge did, I don't think that she can prove her claim of retaliation because of the fact that she can't show that there was a causal relationship between the termination of her employment and any of the complaints that she raised, because in this instance... He said, look, they had a good reason not to reassign her to this prison where she'd lost the security clearance. She had earlier requested to transfer. Your failure to consider transferring her had to be motivated by something. And if you look at it, we think the motivation or a motivation, maybe it's a mixed case, is retaliation against her for causing all this trouble by complaining about how she was treated at MDOC. So what's your response to that? She testified that the stated reason that Correct Care Solutions gave, that she was gate-stopped because she gave a false report and failed to follow a directive, that she didn't have any basis for believing that that stated reason was false. And she didn't have any... His case is you should have considered her for transfer. So that admission doesn't go to the issue. But he hasn't demonstrated that there were any other positions available anywhere else that she was qualified to perform. But he says she requested a transfer and got no response on that. She asked for a transfer prior to the decision. Yes. Okay. Did you reply? That's not in the record. So isn't the obligation, if I ask for a transfer and you say nothing and then you're terminated, isn't there some obligation on your part to have said, we had no place in all the various organizations that we supply people to where we could have put you? It didn't have to be in the prison context. There were many other contexts. I assume your company does many things. I think it's the plaintiff's burden to demonstrate that there were other positions available that she was able to perform. How would she know whether there were positions available in your organization? We did extensive discovery, and they had an opportunity to ask those questions and failed to do so. So I do think the burden of proof on that issue was with the plaintiff. She pointed in the absence of her, if there was anything in the record to show that there was another place available, she could win on this logic. But you're saying when there's nothing in the record, I know you're not conceding that, but for purposes of this it will help you, I think, if you do just take it as an assumption. Is your position that if you just assume that there was evidence in the record of another location she could have been transferred to, that she could win? But she can't win if there's nothing in the record to show where she could be transferred to? I don't know if that's a fair assumption, because, first of all, it's not in the record. No. Well, but... I'm just trying to isolate this issue. If she thought there was no possibility of transfer, presumably she wouldn't have gone through the request, right? She makes the request because she thinks it can happen. There is no response to that. Next thing she knows, she's terminated, and nobody has given serious consideration to the transfer. But she was terminated because she violated company policy by losing... Can I ask you one other question? Sure, sure. You say the burden is on her. Yes. But isn't the burden on the employer to give a legitimate non-discriminatory reason? And they did give a legitimate non-discriminatory reason, and she agreed that... What was your legitimate non-discriminatory reason for not transferring her? She never asked for a transfer, and that... So if a jury concluded that since she had earlier asked for one, the employer, before just terminating her, should have explained to her that there was no transfer available, if a jury could conclude that, is there anything in the record to show what legitimate non-discriminatory reason the employer gave for not transferring her? Yes, because in the interim, she was gate-stopped because she gave a false report and failed to... That's why she wouldn't have a security clearance. Correct. Does that mean, does a security clearance bar her from working anywhere? Yes, it bars her from working in the jail. And any other facility that the employer runs? There's no evidence that there was any other position anywhere else that she could have done or that was available. Okay, thank you. I think we've exhausted this point. Thank you. Good morning. May it please the Court. Valerie Wright, Assistant Attorney General for the State of Maine, representing the Department of Corrections today, along with former Warden Rodney Buffard and Deputy Warden Troy Ross. I'd like to start by correcting something on the record that I believe was stated earlier. Section 4633 of the Maine Human Rights Act was enacted in 1993, almost 20 years before Furman was decided, and it has not been amended since then. No, no, that wasn't the point. The point was it was not enacted at the same time as the statutory provision that Furman... I see. Thank you, Judge Lynch. That may be, but even... No, that is accurate, isn't it? I believe that is accurate. Okay, thank you. Then I misunderstood what was said earlier. But even given that, Furman was very clear. Employer liability is the rule for employment discrimination under the Maine Human Rights Act, whether you're talking about individual supervisors who work for that employer... Does Furman mention 4633? It does not. So then if we thought about what does Furman tell us about what constitutes interference under 4633? Where would I find in Furman some statement construing 4633? Well, you don't find anything in Furman construing 4633. So then how can Furman be clear as to the meaning of 4633? Oh, well, because it can be clear with the meaning of 4633 with respect to who can 4633 be applied to when the claim has to do with discrimination or retaliation in employment. That question Furman does answer clearly. It says it can only be used against the employer. No, it says the employment provision can only be used against the employer. It talks about the entire... As I understand from the Human Rights Commission, their contention is that it's a different claim under 4633. It might have different elements. It might require different proof. Some types of liability that might suffice to show an employer is liable under the employment provision might not suffice to show an individual is liable under 4633, etc. But what Furman... And that's a perfectly coherent way to write a statute. You have just different things that you're trying to prevent. Well, but keep in mind that the statute addresses a lot of different contexts. It addresses housing, public accommodations. So I think in some of those other contexts, 4633 can make sense. 4633 could have said, except under the provision interpreted in Furman. Except for that, this applies to all other aspects of discrimination, and it most certainly does not say that. Well, but it is a very general provision, and the employment discrimination provisions are more specific. Containing no limitation, no reference to the limitations you say we should inherently read into the statute. Because what Furman says is that you have to read the statute as a whole. You cannot view specific provisions in isolation. That's what the plaintiff and the commissioner are asking you to do. They're asking you to read 4633 in isolation. Furman said, we can't do that. Well, don't we traditionally view different words to have different meanings, even when we look at things as a whole? In other words, if the word employer was used in both places and I would look at it as a whole, I would be inclined to think employer means the same thing. But when they use employer in one place and person in another, generally we're inclined to think they mean different things. Well, the word person was used in both places, and the Furman court looked at how the word person was used in the employment discrimination part of the statute. And because the Maine Human Rights Commission was saying the same thing there, that the employment statute uses the word person. But the court said, but wait a second, when you look at the policy underlying this statute, when you look at the way these statutes work, and you look at the statutes as a whole, we do not see where the legislature expressed any clear legislative intent to create an entirely different category of people or entities that can be held liable for employment discrimination. It's not there. I had just one last question on this point. If you're right about 4633, does the retaliation provision in 4633 then just become entirely redundant of the retaliation provision of the employment provision? It seems to me it's the identical words other than the change from person to employer. You're right, it is the identical words. Usually we don't favor interpretations that would render an entire provision redundant as to that. Right, but remember, it would only be redundant specifically in the context of employment discrimination. 4633 applies to housing, public accommodations, et cetera. Do none of those have retaliation provisions? They do not. This is the only one that has one? I believe that's correct. And even the Maine Human Rights Commission noted in their brief that the legislative history behind 4633 says the reason it was tapped on by the legislature was to prevent the Maine Human Rights Commission from losing federal funding because they didn't have certain language that was required to be consistent with the Federal Housing Act and the ADA. So that's why they stuck that on there. Yes, but it... It's there. They could have said as to our ADA law and as to our fair housing laws, and they didn't. That's true, but what the law court said in Furman was that they also could have said explicitly that what we are trying to do here is create a whole other class of persons or entities that can be held liable for employment discrimination, and without that clear statement, the law court said we're not willing to expand it there. Okay, so do you have any arguments other than Furman? On the 4633 issue specifically? Yes. I don't believe so, Your Honor. I think Furman controls. Did anybody suggest submitting this 4633 question to the Maine court? Judge Levy did, in oral argument. And you firmly rejected that? I told him that I... You just read the transcript of it. Yes, I told him I did not think it was necessary because I thought Furman controlled and was clear guidance on this issue. Yes, and you asked him to rule that Furman controlled. Yes, and he did. Yes. Now obviously this court could decide to certify the question to the law court if it decided to. Or we could decide it ourselves. Or you could decide it yourselves. So obviously I'm encouraging you to decide it yourselves in affirming what Judge Levy decided. But I would suggest if for any reason you think you don't want to do that, then I would suggest that you consider certifying the question to the law court because any other... In other words, if I'm going to lose, don't decide it, send it to the law court. Well, yes, but not for that reason. For the reason that if anyone is going to create that kind of, frankly, chaos in this area of law, it should be the law court because they would have to either, I think, overrule their own decision from Furman, which was only six years old, or they would have to find some way to reconcile that result with Furman. Aren't there main court decisions, I know lower court decisions, that do apply 4633 in the employment context against other than employers? There was one case, the Saddleback case... And did chaos ensue? Well, but see, that was decided before Furman when this question of individual liability and, by extension, non-employer liability was still an open question. There's not a single post-Furman main court case? No, not that I'm aware of. At that time, it was still an open question. To the extent that we don't think Furman is clear in extending it, then there's an ambiguity, and because there's an ambiguity, we should give it to the main law court. Yes. I want to go back to the point that the commission made, which is this claim is not made against the employer. This claim is made against the Department of Corrections, and, therefore, any question of the implication of this in the employer situation, which is what you've been arguing, does not actually arise in this case. And the main law court could, if it wanted, in the future draw the distinction that you say actually is inherent here, but I'm not sure why it's inherent here. I'm not sure. The claim is not against the employer. Right. The claim is against an entirely different agency. It's not even against a supervisor hired by the employer. Correct. So the particular concern about extending employer liability to supervisors and respondeat superior, that was the concern in Furman, is simply not presented in this case, because there's no possibility of respondeat superior liability since it's a third party altogether. Well, there could be, if the third party were acting as the principal's agent. There's no allegation. There's no allegation of that here. So we don't have to worry about that. In other words, the logic that you've been pressing from Furman might well be true in a case that presented the application of that logic. This case can't possibly. So why is Furman concerned about the purpose of legislature, even germane to the question, since you have the text person? Right. Unless you mean to say Furman held the word person can never mean anybody but the employer. That's exactly what I'm saying. The argument for that is based on the purpose set forth in Furman. But the purpose set forth in Furman was derived from a concern about respondeat superior liability, not third parties. It doesn't even speak to that issue. But I think it does in the sense that what it's saying is that the purpose of the Maine Human Rights Act was to hold employers, to put employers on the hook, to make employers have the ultimate responsibility for protecting their employees from harassment. Take a case like Saddleback. So a third party threatens an employer economic harm unless it discriminates. Yes, and then the employer... So no liability? No liability under the Maine Human Rights Act. But keep in mind that in that Saddleback case, the plaintiff not only prevailed on the Maine Human Rights Act claim, which we're of course saying they shouldn't have, the plaintiff also prevailed on a tortious interference with business relations claim against that third party. And Maine would want to have a policy that you can never make that a discrimination claim? That's what the Maine Human Rights Act... The fact that it was done to further discrimination is irrelevant for purposes of how the jury should look at it? Why would Maine want that policy? Because Maine wants the employer to be the one on the hook, to be the one responsible for taking care of its employees, and there are other ways, such as that tortious interference claim. Okay, thank you, counsel. Thank you very much. Judge Lynch, I wanted to come back to the point that you raised about what was said, whether there were any other openings. And I did, when I was speaking, overlook Paragraph 190 in our Statement of Additional Material Facts, which is on page 87 of the stipulated record, indicates that Lamson told Roy that she could not work for the MDOC, and Lamson's the supervisor, and CCS had no openings at other facilities so her employment would be terminated. So she was affirmatively told that there were no other openings. And then further, Paragraph 196 on that same page, Lamson had no knowledge whether CCS had openings at its two non-MDOC sites. So I think... Okay, I appreciate your candor. In terms of the... So can you just, I mean, that's not all that helpful to you. Correct. So how do you overcome that aspect of the record? She made it up. That second one that I read is her testimonies, her deposition testimony that when she said that, she had no knowledge whether there were any openings. Roy said she... Oh, it wasn't Roy saying she had no knowledge. Right. It is Roy saying that the supervisor who made the statement to her had no knowledge, but she said it anyway. She lied. Okay. There's two ways you could say I have no knowledge, which is I don't know of any openings, and then her admitting that I said it without having any knowledge about whether there were any openings. Those are two different ways of saying it. Right. So the first one is Roy testifying that during that final meeting, Lamson told me there are no openings. Then I took Lamson's deposition, and during her deposition she said the second one, which is I had no knowledge whether there were any openings. Okay. Thank you. Thank you very much.